## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     Criminal No. 3:19-cr-117–HEH |
| | ) |
| JAMES MICHAEL JOHNSON, | ) |
| | ) |
| Petitioner. | ) |

## <u>MEMORANDUM OPINION</u>
### (Denying 28 U.S.C. § 2255 Motion)

Petitioner James Michael Johnson ("Johnson"), a federal inmate proceeding *pro se*, submitted this motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion," ECF No. 226). The Government has responded, asserting that Johnson's claims lack merit. For the reasons set forth below, Johnson's § 2255 Motion will be denied.[1]

## I.    PROCEDURAL HISTORY

### A.    Criminal Trial and Appeal

Following a jury trial, Johnson was convicted of: one count of conspiracy to commit wire fraud (Count One); four counts of wire fraud (Counts Three, Four, Six, and Seven); and, one count of conspiracy to launder monetary instruments (Count Eight). (ECF No. 114 at 1.) The Court sentenced Johnson to ninety-seven (97) months of imprisonment. (*Id.* at 2.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system. The Court corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

On appeal, Johnson asserted the evidence was insufficient to support his

convictions. *United States v. Johnson*, No. 21-4126, 2022 WL 4376082, at *1–2 (4th Cir.

Sept. 22, 2022), *cert. denied*, 143 S. Ct. 412 (2022). In rejecting those challenges, the

United States Court of Appeals for the Fourth Circuit stated:

> To convict Johnson of conspiracy to commit wire fraud under 18
> U.S.C. § 1349, the Government had to establish that (1) two or more people
> agreed to commit wire fraud, and that (2) Johnson willfully joined the
> conspiracy intending to further its unlawful purpose. *See United States v.
> Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018). Wire fraud, the underlying
> offense, required evidence that Johnson (1) devised or intended to devise a
> scheme to defraud, and (2) used or caused the use of wire communications
> to further the scheme. *See id.* at 335. We have explained that, "[t]o establish
> a scheme to defraud, the government must prove that the defendant[s] acted
> with the specific intent to defraud." *United States v. Wynn*, 684 F.3d 473,
> 478 (2012) (cleaned up). "Thus, the . . . wire fraud statute[ ] ha[s] as an
> element the specific intent to deprive one of something of value through a
> misrepresentation or other similar dishonest method, which indeed would
> cause him harm." *Id.* Therefore, "to convict a person of defrauding another,
> more must be shown than simply an intent to lie to the victim or to make a
> false statement to him." *Id.* As the Supreme Court has explained, a scheme
> to defraud "must be one to deceive the [victim] *and* deprive [him or her] of
> something of value." *Shaw v. United States*, 580 U.S. 63, 72 (2016).
> However, specific intent may be "inferred from the totality of the
> circumstances and need not be proven by direct evidence." *United States v.
> Godwin*, 272 F.3d 659, 666 (4th Cir. 2001).
> In challenging his conspiracy conviction, Johnson contends that the
> Government did not prove the specific intent required. Specifically, Johnson
> avers that the evidence supported the conclusion that he did not intend to
> deprive the victims of anything of value and instead wanted them to make
> money and receive their capital. However, to the contrary, the evidence
> showed that, in order to induce investments, Johnson made a series of
> promises to investors that their loans would be "risk free," guaranteed, and
> would earn high rates of interest. However, none of these promises were
> fulfilled. Johnson was aware that previous promises and representations
> were not honored, yet he continued to induce new investments with identical
> promises. Regardless of whether Johnson hoped that the investors he
> recruited would be made whole, he was still aware that their investments had
> been disbursed to the Defendants and others and could only be returned with
> money from new, equally fraudulent investments. This evidence was

sufficient to show Johnson's specific intent. *See id.* at 666–67 (holding that evidence that defendants repeatedly appropriated investors' money, even in the face of promises to past investors not fulfilled, was sufficient to show specific intent to defraud). Accordingly, there was sufficient evidence to support Johnson's wire fraud and conspiracy to commit wire fraud convictions.

Next, Johnson challenges the sufficiency of the evidence supporting his conviction for conspiracy to commit money laundering. To prove Johnson participated in a conspiracy to launder money, the Government must "prove that (1) a conspiracy to commit . . . money laundering was in existence, and (2) that during the conspiracy, the defendant knew that the proceeds . . . had been derived from an illegal activity, and knowingly joined in the conspiracy." *United States v. Alerre*, 430 F.3d 681, 693–94 (4th Cir. 2005). On appeal, Johnson argues only that there was no evidence that he personally handled any money. However, such is not an element of the crime. In any event, contrary to Johnson's contention, the record contains evidence that Johnson personally accepted checks from victims of the scheme and forwarded them to codefendants. As such, this claim is without merit.

*Id.* (footnote omitted).

### B.    The § 2255 Motion

In his § 2255 Motion, Johnson raises the following claims for relief:

| Claim One | Counsel failed to investigate. "Johnson was paid 2[.5%] to 5% percent under the terms of a commission agreement . . . . This agreement which Johnson told [Paul] Gill about was not introduced to the Court. In addition, Johnson was paid on his sales exclusively. Johnson paid taxes on all his earnings from Chimera. Smith, Bridge and Garrett paid no taxes on distributions that they received. Johnson also shared his commission with Safe Equity Solutions and Myrl Hairfield. Myrl introduced Johnson to Charlie Kruse (Inspire) and Jay Diedzic of Blackrock Oil. Myrl had secured $100,000 in a loan to Inspire prior to meeting Johnson. Earnings through Safe Equity Solutions also reported taxes paid on earnings. Gill did not investigate the above items or question Johnson's partner at Safe Equity Solutions." (ECF No. 226 at 4.) |
|---|---|
| Claim Two | Counsel failed to request Jencks Act material. (*Id.* 4–6.) |

3

| | |
|---|---|
| Claim Three | "Conviction obtained by unconstitutional failure of the FBI to inform Johnson that the call was recorded." (*Id.*) |
| Claim Four | "Violation of Confrontation Clause." (*Id.* at 9.) |
| Claim Five | Counsel failed to discuss the plea offer with Johnson. (*Id.* at 10.) |
| Claim Six | Counsel performed deficiently in questioning James "Jay" Smith and failed to introduce any evidence for the defense. (*Id.*) |
| Claim Seven | "Gill did not point out that Johnson was not in the conspiracy." (*Id.* at 13.) |
| Claim Eight | "Gill ignored Johnson's request to sever." (*Id.*) |
| Claim Nine | "Failure to point out false or misleading evidence." (*Id.* at 19.) |
| Claim Ten | "Gill committed prosecutorial misconduct." (*Id.* at 29.) |
| Claim Eleven | Counsel "failed to tell the Court about Johnson's mental illness and mental capacity." (*Id.*) |
| Claim Twelve | Counsel fail[ed] to investigate Johnson's relationship with Myrl Hairfield. (*Id.*) |
| Claim Thirteen | Counsel failed to call James Hill, Jim Pass, and Fred Duff as witnesses at trial. (*Id.* at 33.) |
| Claim Fourteen | Counsel did not explore the fact that Agent Wynn's failure to appear at the trial violated the Confrontation Clause. (*Id.*) |
| Claim Fifteen | Counsel failed to recognize errors in calculating the restitution Johnson owed. (*Id.*) |
| Claim Sixteen | "Counsel should have made a motion to exclude prior acts in the investment business on the grounds that it was unreliable and represented inadmissible evidence." (*Id.* at 39.) |
| Claim Seventeen | Counsel failed to introduce evidence to show Johnson was a reputable person. (*Id.*) |

4

| Claim Eighteen | Counsel lost "18 reference letters from friends and co-workers of Johnson." (*Id.* at 42.) |

## II. Claims Barred From Review

The doctrine of procedural default prevents petitioners from bringing claims on habeas review that they could have raised on direct review, but did not do so. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (citations omitted) ("The background for our discussion is the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice.") Because Johnson could have raised Claims Three and Four on direct appeal and did not, they are barred from review here.[2] Accordingly, Claims Three and Four will be dismissed.

## III. Ineffective Assistance of Counsel

### A.    Applicable Law

To demonstrate ineffective assistance of counsel, a convicted defendant must show (1) that counsel's representation was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

[2] Johnson fails to demonstrate cause and prejudice to excuse his default.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice.  *Id.* at 697

### B.   Failure to alert jury to limited commissions earned by Johnson and the fact that he paid taxes on those commissions

In Claim One, Johnson faults trial counsel for, *inter alia*, failing to alert the jury to his limited earnings from the sale of the short-term loans, the fact that he paid taxes on those earnings, and others associated with Chimera, the entity at the center of the scheme to defraud, did not pay taxes.  During both his opening and closing statements, counsel mentioned the low commissions Johnson was paid for obtaining the short-term loan.  (*See e.g.*, ECF No. 134 at 147–48; ECF No. 136 at 849–50.)  Counsel argued this reflected that "there is no suggestion here that erases the notion of Mike Johnson as anything other than a salesman," (ECF No. 136 at 236), and that "the salesperson getting five percent commissions is not a person who is deliberately entering into a scheme to defraud," (ECF No. 136 at 245).  Accordingly, counsel aptly utilized the evidence regarding Johnson's limited commissions to argue that he was just a salesman and lacked the knowledge and financial motivation to defraud any of the victims.

With respect to the fact that Johnson paid taxes on his income and that other individuals associated with Chimera allegedly did not, counsel reasonably perceived that this information was of limited value in proving Johnson's innocence.  Further, Johnson fails to explain what additional exculpatory evidence would have been yielded by counsel

investigating Myrl Hairfield and SafeEquity Solutions. Given these circumstances, Johnson fails to demonstrate that counsel acted in a constitutionally unreasonable manner or that, but for counsel's performance, the result of the proceedings would have been different. Accordingly, Claim One will be dismissed.

### C.    Alleged failure to obtain Jenck's Act material

In Claim Two, Johnson faults counsel for failing to obtain Jenck's Act material. Counsel swears that: "The court ordered production of Jencks/*Giglio* material. DOC 34 at 4. Counsel definitely received materials subject to Jencks/*Giglio* before trial, as well as law enforcement reports." (ECF No. 246-1 at 1.) This claim lacks factual merit. Because Johnson fails to demonstrate deficiency or prejudice, Claim Two will be dismissed.

### D.    Alleged failure to adequately discuss a possible plea agreement

In Claim Five, Johnson faults counsel for failing to adequately discuss a possible plea agreement.[3] Specifically, in his § 2255 Motion, Johnson states:

> Johnson never saw the plea agreement. Gill did not review the plea agreement with Mr. Johnson. Mr. Gill when mentioning the plea agreement, said, "We win more times than you would think." Johnson was not aware of the 98% conviction rate, Johnson did not have the skill and knowledge to make a reasonable decision and he was not given the pros and cons of the plea agreement. Gill stated, "they can indict a ham sandwich if they desire." Gill mentioned that because of Johnson's age, health, and no prior arrests, he would probably get home detention if we lost. Now, Johnson, age 72, has been in Petersburg prison for over 2 1/2 years.

(ECF No. 226 at 10.)

---

[3] In his Reply, Johnson states that "in total the discussion of a plea agreement last no more than 2–5 minutes." (ECF 254-1, at 3.)

However, the Government never extended a formal plea offer to Johnson. Rather, counsel explains the circumstances surrounding the plea negotiations as follows:

> Counsel encouraged Mr. Johnson several times to consider a plea. Counsel also conferred with prosecutors about a possible plea agreement. The first concrete conversation about a plea bargain with prosecutors was in January 2020. Prosecutors viewed this as a complex case with over 10 victims and loss amounts over $3 million, that theoretically could get advisory Guideline range to 51 to 63 months on a guilty plea, per the prosecutors; defense counsel thought it could be much higher, especially if it included sought after but never recovered gains, i.e., intended loss.
>
> Counsel shared the plea discussion with Mr. Johnson, who expressed worry about the impact of a guilty plea on his aging mother. He also advised after arraignment on the superseding indictment that he did not want to talk about Stuart Anderson's Statement of Facts for purposes of Mr. Anderson's plea. Counsel raised the issue of pleading guilty at least once more, but Mr. Johnson wanted to go to trial. Counsel reverted his focus to that.
>
> Counsel may have recited the ham sandwich line and the line about acquittals being possible. Counsel may not have specifically mentioned a 98 percent conviction rate. But counsel discussed and encouraged plea bargaining, because conviction seemed likely or very possible, and a plea agreement would likely result in a much lower sentence, especially if it included cooperation.

(ECF No. 246-1 at 2.)

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Lafler v. Cooper*, 556 U.S. 156, 162 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Generally, claims of ineffective assistance of counsel during the plea process fall into three categories. First, "the [complete] failure of a defense attorney to timely inform his client of a plea offer constitutes unreasonable professional assistance." *United States v. Brannon*, 48 F. App'x 51, 53 (4th Cir. 2002) (citing *United States v. Blaylock*, 20 F.3d 1458, 1465–66 (9th Cir. 1994)); *see Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003) (citations omitted). Second, a defense

attorney's inaccurate advice or misinformation in conveying a plea offer may constitute deficient assistance. *Brannon*, 48 F. App'x at 53 (citing *Paters v. United States*, 159 F.3d 1043, 1047–48 (7th Cir. 1998)); *see United States v. Merritt*, 102 F. App'x 303, 307–08 (4th Cir. 2004); *Wolford v. United States*, 722 F. Supp. 2d 664, 688 (E.D. Va. 2010) (concluding that counsel was deficient where he "misled [the petitioner] into believing that she had some possibility of prevailing at trial on the basis of several non-viable defenses"). Third, incomplete advice in conveying a plea also may provide a basis for a claim of ineffective assistance of counsel. *See Wolford*, 722 F. Supp. 2d at 689 (concluding that "counsel's incorrect and incomplete legal advice to [the petitioner] during the plea negotiation process was objectively unreasonable" (citing *Strickland*, 466 U.S. at 688)); *see also United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) ("[A] defendant has the right to make a reasonably informed decision whether to accept a plea offer." (citing *Hill v. Lockhart*, 474 U.S. 52, 56–57 (1985); *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948))). Here, Johnson obliquely suggests that counsel provided incomplete and inaccurate advice during the plea process. No need exists to resolve any factual dispute as to whether that is true because the present record does not demonstrate prejudice.

"[T]he prejudice inquiry focuses on 'whether counsel's constitutionally ineffective performance affected the outcome of the plea process.'" *United States v. Merritt*, 102 F. App'x 303, 307 (4th Cir. 2004) (quoting *Hill*, 474 U.S. at 59). Johnson must demonstrate "a reasonable probability" that he would have accepted a plea offer if he "had . . . been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012);

9

*see Merritt*, 102 F. App'x at 307. Such a showing requires a convicted defendant to "present some credible, non-conclusory evidence that he would have [accepted a proffered plea] had he been properly advised." *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)).[4] Johnson has not done so. At no point, does Johnson provide "any statement that he would have accepted the government's plea offer if properly advised." *Puglisi v. United States*, 586 F.3d 209, 216 (2d Cir. 2009). This alone forecloses this claim. *Id.*

"A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Sanders*, 341 F.3d at 723 (citing *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998); *Engelen*, 68 F.3d at 241); *see Chesney v. United States*, 367 F.3d 1055, 1060 (8th Cir. 2004). Although Johnson did not take the stand at trial, at sentencing, he continued to insist that, "[a]t no time did I intend to steal my friend[s'] money." (ECF No. 132 at 36.) Further, during these post-conviction proceedings, Johnson has continued to assert that he is innocent of the conduct which formed the basis for his convictions. For example, Johnson states:

> As Judge Hudson explained in his instructions to the jury, there must be an agreement to commit crimes to have a conspiracy. It also extends to agreeing to aide another person in planning or commi[ting] a crime, which Johnson never did. He was only a salesman .... Johnson was duped and fraudulently induced to sell [for] Chimera."

---

[4] In this case there was no formal plea offer, only plea discussions.

(ECF No. 226 at 13.)  Given these circumstances, the Court finds "palpably incredible" any suggestion Johnson would have pled guilty and accepted a lengthy prison sentence. *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (internal quotation marks and citation omitted); *see Sanders*, 341 F.3d at 722–23; *Jackson v. United States*, 638 F. Supp. 2d 514, 581–82 (W.D.N.C. 2009) (concluding that in light of the petitioner's expressed desire to fight the charges, he failed to demonstrate a reasonable probability that he would have accepted the plea offer during the window of opportunity to accept the plea); *Goudie v. United States*, 323 F. Supp. 2d 1320, 1335–36 (S.D. Fla. 2004) (rejecting petitioner's claim that he would have accepted the offer when, at the time the plea was open, the petitioner insisted he was innocent).  Claim Five will be dismissed.

### E.    Alleged failure to adequately cross-examine co-defendant Smith

In Claim Six, Johnson primarily complains that counsel did an inadequate job cross-examining Johnson's codefendant, James Smith.  Johnson asserts: "Smith was the most important witness, he knew when Johnson was paid, the percentage commission received and he was aware of all the sales material he supplied Johnson, which was used in sales meetings."  (ECF No. 226 at 10.)

Defense counsel explains:

> Counsel's defense theory revolved around treating Mr. Johnson as a sales person, not an investment advisor; someone who did not, and did not need to know everything about how the investment worked.  That theme went to how counsel treated individual witnesses, opening, and closing.  As for attacking Smith as the more responsible defendant, counsel made the further tactical decision not to focus on attacking him, recognizing that the prosecution team would likely do, which it did.

11

(ECF No. 246-1 at 3.)  Johnson fails to demonstrate that counsel's cross-examination was constitutionally deficient.  Moreover, as explained in greater detail below, Johnson fails to demonstrate any reasonable probability that counsel could have elicited any information on cross-examination of Smith that would have resulted in a different result. Claim Six will be dismissed because Johnson fails to demonstrate deficiency or prejudice.

**F.    Alleged failure to demonstrate Johnson was not part of the conspiracy**

In Claim Seven, Johnson faults counsel for not eliciting evidence and arguing that Johnson was merely a salesman who was duped and was not a member of the conspiracy. Counsel, however, argued in his opening and closing that Johnson was simply a salesman.  Johnson also faults counsel for not pointing out that Smith was not included in many of the emails with the other conspirators associated with the Chimera scheme. Although there was significant evidence demonstrating Johnson had actual knowledge of the scheme to defraud the Chimera investors, the evidence overwhelmingly demonstrated that Johnson was willfully blind to the fraudulent nature of the loans he was soliciting.[5]

---

[5] The United States Court of Appeals for the Fourth Circuit has explained:

> The government can prove the knowledge element of a crime by showing that the defendant either had actual knowledge or was willfully blind to facts he should have known.  *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir.1996). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." *Id.* (citation and internal quotation marks omitted).  When given, a "willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991). For a district court to give a willful blindness instruction, "all that is

The Government's first witness was Todd Varon. Varon was the founder of company called Ultrasonic Probe, which had developed a new medical device. (ECF No. 134 at 45.) In 2016, Varon was seeking to raise capital for this company. (ECF No. 134 at 46.) In that process he was introduced to Johnson in early 2016. (ECF No. 134 at 47.) Johnson told Varon that a London-based company called Chimera, run by Michael Bridge, could potentially be interested in investing in Varon's company. (ECF No. 134 at 51.)[6] Johnson showed Varon documentation reflecting that Chimera had a billion and a half euros in a bank account. (ECF No. 134 at 51–52.) Varon recounted Chimera's and Johnson's proposal for investing in Varon's company:

> And so their proposal was that they would invest in our company from $3 to $5 million. But before they would make that investment, we would deposit a certain amount of money as a loan or earnest money. They used different terms. But basically we would lend money to them for a period of four months, and they would pay us a good interest rate during that time.
> That money would be guaranteed, and that at the end of those four months Chimera would make the capital investment in our company and also return our principal and the interest.

(ECF No. 134 at 51.)

Pursuant to these conversations, Johnson showed Varon documents reflecting that in return for a loan of $200,000, at the end of 4 months Chimera would return the $200,000 along with a $16,000 interest payment. (ECF No. 134 at 58–59.) Additionally,

---

necessary is evidence from which the jury could infer deliberate avoidance of knowledge."

*United States v. Logan*, 593 F. App'x 179, 184–85 (4th Cir. 2014) (quoting *United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994)).

[6] Brian Michael Bridge was the CEO of Chimera. (ECF No. 135 at 113.)

13

Johnson insisted the principal would be "guaranteed" to be safe. (ECF No. 134 at 54.)

Specifically,

> It would be guaranteed by Santander Bank. That Santander Bank had the money. Had a billion and a half euros in an account [for Chimera], and that they would use this blocked funds facility in our benefit . . . . Santander Bank would hold the funds, put an administrative hold on that money, for the benefit of us as the lender. And that if Chimera did not pay back at the end of the four months, that Santander Bank would send us the money along with a penalty.

(ECF No. 134 at 54.) To support the notion that Santander Bank would guarantee the loans, Johnson and Smith provided Varon with documents from Miguel Rubalcava of Santander Bank. In these documents, Rubalcava represented that Chimera and Michael Bridge had an account with Santander Bank. (ECF No. 134 at 70–76.)

Varon's subsequent research revealed that: (1) Santander Bank did not provide Blocked Fund Letters; (2) Rubalcava was not an employee of Santander Bank; (3) there was no Santander Bank office at that address listed on the correspondence; (4) "[t]he account number referenced in the correspondence [did] not have the full 20 digits numbers of a Santander account"; and, (5) "[t]here [was] no 'CIF' number referenced which [was] the number used to identify companies in Spain." (ECF No. 134 at 76–77.) Varon shared these concerns with Johnson in an email dated May 17, 2016, and directed Johnson on how Johnson could assure him this deal was not fraudulent. (ECF No. 134 at 73, 77–78.) Johnson and Smith simply told Varon his information was wrong and that he should speak to Rubalcava. (ECF No. 134 at 78.) On June 22, 2016, Varon followed up with email to Johnson offering to have a relative of his "who live[d] in Madrid who would be willing to visit the office on second floor of the building to confirm that it is a

Santander office and that Rubalcava works there." (ECF No. 134 at 83–85.)  Johnson did

not take Varon up on that offer or any of Varon's suggestions to verify the legitimacy of

Santander Bank's relationship with Chimera.  (ECF No. 134 at 85.)  Varon and his

company decided not to lend money to Chimera.  (ECF No. 134 at 86.)

  The evidence rather plainly demonstrated that Johnson was significantly more

interested in obtaining his payouts on loans, than in ensuring the legitimacy of the

Chimera loan scheme.  Around May 20, 2016, (ECF No. 134 at 102), Johnson told

potential Chimera investor Ernest Finn that he had "thoroughly" investigated Chimera

and that "Mr. Bridge was of high integrity and a very honest individual."  (ECF No. 134

at 126.)  Finn ultimately lent Chimera $100,000.  (ECF No. 134 at 105.)  Johnson told

Finn the loan was risk free and provided Finn with a Blocked Funds Letter, purportedly

from Santander Bank that stated in pertinent part:  "We also confirm that these funds held

under our supervision and in our custody will not be permitted to be withdrawn, moved,

or transferred for any reason by Chimera Group Limited for any reason during this

blocking period."  (ECF No. 134 at 110.)  Despite the fact that Varon had recently

conveyed to Johnson his misgivings about whether Chimera had a real relationship with

Santander Bank, Johnson did not mention anything to Finn.  (ECF No. 134 at 110–11.)

Chimera never paid Finn back his $100,000.  (ECF No. 134 at 111.)

Johnson told Sharon Hill, another potential Chimera investor, that he personally had visited London and checked out Chimera. (ECF No. 134 at 147.) That was simply not true.[7]

The Community Fire investment of $100,000 with Chimera occurred on May 31, 2016. (ECF No. 134 at 185.) Community Fire was due a payout of all funds plus interest as of February 13, 2017, which the investors demanded. (ECF No. 134 at 195–96.) Johnson was aware the funds were not returned as of that date. (ECF No. 134, at 198.) Community Fire never received the promised funds. (ECF No. 134 at 199.)

As of February 17, 2017, Johnson continued to solicit funds/loans/investments from new individuals and entities on behalf of Chimera, including Jerome Rifino of Logica Health Care Group. (ECF No. 135 at 53.) Johnson now represented himself as a manager partner at Chimera. (ECF No. 135 at 53.) Johnson was not particularly interested in Logica Health Care Group's business plans. (ECF No. 135 at 55.) In August of 2017, Mr. Rifino also informed Johnson that the standby letters of credit he was circulating on behalf of Chimera were fake. (ECF No. 135 at 61.)

On April 26, 2017, Charles Kruse, on behalf of his company, loaned $500,000 to Chimera. (ECF No. 135 at 79.) In the process leading up to that loan, Johnson repeatedly assured Kruse that Chimera had successfully funded other companies through this process. (ECF No. 135 at 73–74.) Johnson assured Kruse that he could monetize the Standby Letters of Credit to provide interim financing. (ECF No. 135 at 90.) Soon after

---

[7] Between January 1, 2010 and June 5, 2020, Johnson never travelled to London. (ECF No. 134 at 172, 175.)

transferring the money to Chimera, Kruse learned the Standby Letters of Credit were fraudulent. (ECF No. 135 at 81.) Charlie Kruse and his company never saw the return of their $500,000. (ECF No. 135 at 87.)

As of September 26, 2017, Johnson received a copy of an email from a Santander bank employee, via Mr. Diedzic, regarding the Standby Letters of Credit Johnson had been circulating on behalf of Chimera and Bridge. (ECF No. 135 at 25–27.) The e-mail stated the letters of credit were "fake." (ECF No. 135 at 26–27.)

Johnson acknowledged that as of October 2017, when he was talking to law enforcement agents, that none of the individuals and entities from whom he had solicited funds for Chimera had seen a return of their principal. (ECF No. 135 at 183.) Johnson further lied and stated that the last time he had solicited funds had been around June of 2016. (ECF No. 135 at 184.) Johnson also stated the last commission he had received from Chimera had been around September of 2016. (ECF No. 135 at 185.) At that time, Agent Leah Wynn warned Johnson

> that Chimera is a scam, that we believe that we at the time had evidence to show that, and that the first time that he realized people weren't getting their money back, that he should have stopped any sort of sales. . . .
> . . . Agent Wynn stated that if he continued any future deals, that it would solidify basically his position in the scam.

(ECF No. 135 at 188–89.) Johnson stated he would refrain from any future deals. (ECF No. 135 at 189.)

Nevertheless, roughly three weeks after Agent Wynn informed Johnson that Chimera was a scam, Johnson continued to participate with Michael Bridge and others in

attempting to persuade individuals into lending money to Chimera. (*See, e.g.*, ECF No. 136 at 9–13.)

In short, Johnson fails to demonstrate that counsel performed deficiently with respect to showing that Johnson was not a knowing member of the conspiracy. Furthermore, Johnson fails to demonstrate any reasonable probability that further efforts by counsel could dissuade the jury from concluding that he was a member of the conspiracy. Accordingly, Claim Seven will be dismissed.

### G.   Failure to move to sever

In Claim Eight, Johnson faults counsel for failing to move to sever his trial from that of his coconspirator, Jay Smith. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). In conspiracy trials, "joinder is highly favored." *United States v. Chorman*, 910 F.2d 102, 114 (4th Cir. 1990) (citation omitted). A case should only be severed when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Given the above limitations on severance, Johnson fails to suggest why a motion for severance was likely to succeed. Moreover, counsel believed that having Johnson's case tried with Smith would allow the jury to make the distinction between their relative culpability. (ECF No. 246-1 at 3–4.) Smith was a more central member of the conspiracy. Smith received greater payouts of the solicited funds and orchestrated disbursements. In the end, however, these distinctions were not sufficient to dispel the

conclusion that Johnson fully joined the conspiracy. Because Johnson fails to demonstrate deficiency on the part of counsel, or any resulting prejudice, Claim Eight will be dismissed.

### H.    Alleged failure to point out false or misleading evidence

In Claim Nine, Johnson argues that counsel failed to point out false or misleading evidence. Johnson, however, in the ensuing paragraph, fails to articulate how the described information was false or misleading. For example, Johnson notes that, prior to the Chimera scheme, James Hill had been an investment client of his twenty years. Johnson insists that during that period, Mr. Hill "never lost money or had any funds stolen." (ECF No. 226 at 19.) No one suggested that Johnson stole any of Mr. Hill's money prior to the Chimera venture.

Johnson then suggests that counsel should have made greater utility of Exhibit 52. (ECF No. 226 at 19.) Counsel explains that Exhibit 52

> held more potential utility for the prosecution, in that it further emphasizes that ultimately no person and no thing really makes money at Chimera except its small group of principals, whether big commercial investment or Community Fire. Which tied into another line of the prosecution, involving the agents who interviewed Mr. Johnson at length on October 16, 2017, and then told him that he should have stopped any sort of sales once he realized "investors," including good friends, never got their money back after an initial short-term investment or rollover. As another agent reported, he was with Agent Wynn when she related to Mr. Johnson that if he continued any future deals, it would "solidify basically his position in the scam," remarks prompting Mr. Johnson to agree that he would refrain from any future deals, a pledge he did not keep.

(ECF No. 246-1 at 4 (citation omitted).) Given these circumstances, Johnson fails to demonstrate deficiency or prejudice. Claim Nine will be dismissed.

### I.    Failure to interview or call as a witness Stuart Anderson

In Claim Ten, Johnson contends that counsel should have interviewed and called as a witness Stuart Anderson. Anderson served as the escrow attorney for the Chimera conspiracy. His presence provided investors with the illusion of extra security because their funds passed through a U.S.-based attorney before moving offshore. Anderson pled guilty to one (1) count of wire fraud. Counsel acknowledged that he possessed several interviews of Anderson. Counsel states that Anderson "said little about Johnson, helpful or harmful." (ECF No. 246-1 at 4.) Johnson fails to identify with specificity what information counsel could have, or should have, elicited. Johnson demonstrates no deficiency or prejudice. *See United States v. Terry*, 366 F.3d 312, 316 (4th Cir. 2004) (observing that where a petitioner faults counsel for not calling a witness, the petitioner should provide "concrete evidence of what [the witness] would have testified to in exculpation"); *Bassette v. Thompson*, 915 F.2d 932, 941 (4th Cir. 1990) (dismissing claims where petitioner failed to make an adequate proffer of testimony of witness). Because Johnson fails to demonstrate deficiency or prejudice, Claim Ten will be dismissed.

### J.    Failure to tell the jury about Johnson's mental illness

In Claim Eleven, Johnson notes that he "was disabled with clinical depression, chronic anxiety, and PTSD. Most of his days were filled with panic attacks and heart palpitations . . . . He could not perform his duties as financial advisor." (ECF No. 226 at 29.) Apparently, Johnson believes counsel should have introduced this evidence to

demonstrate that Johnson was not competent or blameworthy for his conduct involving the Chimera scheme. Counsel explains:

> Counsel agrees he did not interject mental illness or capacity into the case. Nothing Mr. Johnson said about his condition or disclosed in his behavior suggested that he was *incompetent* at the time of trial, during the time we worked together before trial, or during the time he was receiving disability benefits. Putting competency or capacity at issue could also require disclosures and examinations by experts appointed by the Court or retained by the United States, which would be potentially problematic. *See* Fed. R. Crim. P. 12.2(b), (c)(1).

(ECF No. 246-1 at 4–5.) This explanation by counsel appears eminently reasonable.

Additionally, it is apparent to the Court that there was another reason why counsel would want to avoid putting Johnson's mental fitness at issue. Johnson suggests that his mental problems prevented him from performing his prior functions as a financial advisor. But, the record reveals that the real reason Johnson stopped functioning as financial advisor was because he lost his Financial Industry Regulatory Authority ("FINRA") registration in October of 2015 for fraudulent or dishonest conduct. (ECF No. 109 at 17; ECF No. 106-1.) All this suggests that at the time of the inception of the Chimera scheme, Johnson was eagerly looking for a new source of income and was largely indifferent as to how that may have impacted his friends and former clients. Counsel acted reasonably in not presenting evidence of Johnson's mental illness and Johnson fails to demonstrate prejudice. Claim Eleven will be dismissed.

### K.    Failure to investigate and call Myrl Hairfield

Johnson criticizes counsel for failing to investigate and call Myrl Hairfield as a defense witness. Johnson suggests that Hairfield could have testified Johnson was not a

member of the conspiracy. This is not adequate. *See United States v. Roane*, 378 F.3d

382, 400–01 (4th Cir. 2004) ("[a]iry generalities, conclusory assertions and hearsay

statements [do] not suffice to stave off summary judgment or entitle a habeas petitioner to

an evidentiary hearing" (internal quotation marks and citations omitted)). Johnson fails

to state what *facts* Hairfield could have testified to that would have benefitted Johnson.[8]

*See Terry*, 366 F.3d at 316. Johnson fails to demonstrate counsel acted unreasonably by

not calling Hairfield. Additionally, Johnson fails to demonstrate a reasonable probability

of a different result had counsel called Hairfiled. Claim Twelve will be dismissed.

**L.    Failure to call James Hill, James Pass, and Fred Duff**

In Claim Thirteen, Johnson criticizes counsel for failing to call Hill, Pass, and

Duff during his trial. These three individuals testified on Johnson's behalf at sentencing.

At sentencing, they bolstered Johnson's theme that Johnson would not knowingly steal

from his friends and suggested Johnson was duped along with the victim-investors he

solicited on behalf of Chimera. (*See, e.g.*, ECF No. 132 at 10, 15, 19.) To the extent that

these individuals could even testify on Johnson's behalf as to his character during the

trial, their testimony would be far outweighed by the fact that their testimony would open

the door to the fact that, immediately prior to participating in the Chimera scheme,

Johnson had to surrender his FINRA registration for making material misrepresentations

to investors in a land scheme. (*See* ECF No. 106-1.) In light of the above facts, Johnson

---

[8] Johnson suggests that Hairfield could testify that both Hairfield and Johnson received their commissions on the Chimera deals that they did jointly. (ECF No. 257 at 7.) There was no question that people soliciting deals on behalf of Chimera were being paid.

fails to demonstrate that counsel performed deficiently or that he was prejudiced. Claim Thirteen will be dismissed.

### M.    Failure to allege a Confrontation Clause challenge with respect to Agent Wynn

In Claim Fourteen, Johnson contends that counsel was deficient for failing to raise a Confrontation Clause challenge with respect Special Agent Leah Wynn. At trial, Investigator Matthew Alicona from the Virginia State Corporation Commission testified about two interviews he and Agent Wynn conducted with Johnson on October 16, 2017 and June 5, 2019. Johnson contends that because Agent Wynn was the primary person who questioned him, the Government's failure to call Agent Wynn violated his rights under the Confrontation Clause.

The Confrontation Clause generally bars the "admission of *testimonial* statements of a witness who did not appear at trial . . . ." *Crawford v. Washington*, 541 U.S. 36, 53 (2004) (emphasis added). "A statement is 'testimonial' if its 'primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.'" *United States v. King*, 93 F.4th 845, 851 (5th Cir.) (quoting *United States v. Duron-Caldera*, 737 F.3d 988, 992–93 (5th Cir. 2013)), *cert. denied sub nom. Diggs v. United States*, 145 S. Ct. 213 (2024). "[M]ost questions and inquiries, are not [testimonial] because they do not, and were not intended to, assert anything." *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) (citation omitted). Alicona's testimony reciting Lynn's questions and Johnson's statements did not run afoul of the Confrontation Clause. Counsel

reasonably declined to pursue the arguments raised here by Johnson.  Claim Fourteen will be dismissed.

**N.  Alleged failure to recognize mistakes in the Government's calculation in restitution amounts**

In Claim Fifteen, Johnson suggests that counsel should have challenged the amount of his restitution he is required to pay.  The Government argues that § 2255 provides no avenue to challenge a restitution order.  (ECF No. 246 (citing *United States v. Mayhew*, 995 F.3d 171, 183 (4th Cir. 2021) ("Based on this statutory text, virtually all federal courts of appeals to address the issue have concluded that challenges to restitution orders generally are not cognizable under § 2255.)).)  In his Reply, "Johnson agrees that this is not the right time or place to contest restitution." (ECF No. 257 at 7.) Accordingly, Claim Fifteen will be dismissed.

**O.  Failure to file a pretrial motion to exclude any reference to Johnson's loss of his FINRA registration**

In Claim Sixteen, Johnson contends that counsel should have filed a pretrial motion to exclude any reference to Johnson's loss of his FINRA registration.  The Government did not seek to introduce that evidence in its case-in-chief at Johnson's trial and counsel did not attempt a defense that would elicit that evidence.  The loss of the FINRA registration was clearly relevant and admissible at Johnson's sentencing.  Given these circumstances, Johnson fails to demonstrate that counsel acted deficiently. Accordingly, Claim Sixteen will be dismissed.

### P.    Counsel should have shown that Johnson was a reputable person

In Claim Seventeen, Johnson complains that counsel should have introduced evidence of Johnson's charitable works. This evidence was irrelevant and inadmissible during Johnson's trial. *See* Fed. R. Crim. P. 405(b). Counsel reasonably declined to attempt to introduce this evidence at trial. Claim Seventeen will be dismissed.

### Q.    Alleged loss of reference letters

In Claim Eighteen, Johnson states that he "gave Gill 18 reference letters from friends and co-workers of Johnson. Gill lost the letters before he could present them to Judge Hudson. Neither the jury nor Judge Hudson heard about Johnson's positive attributes which the letters revealed." (ECF No. 226 at 42.) These letters were not admissible at trial. Sentencing counsel submitted sixteen pages of character reference letters on Johnson's behalf at sentencing. Johnson fails to identify whether any letter was omitted. Given these circumstances, Johnson fails to demonstrate deficiency or prejudice. Claim Eighteen will be dismissed.

## IV. Conclusion

For the foregoing reasons, the § 2255 Motion (ECF No. 226) will be denied. Johnson claims and the action will be dismissed. A certificate of appealability will be denied.

An appropriate Order shall issue.

/s/

Henry E. Hudson
Senior United States District Judge

Date: April 17, 2025
Richmond, Virginia

25